In re: **WORLD ACCESS, INC. SECURITIES LITIGATION**

No. **CIV.A. 1:99–CV–43–OD.**

United States District Court,
N.D. Georgia,
Atlanta Division.

March 16, 2004.

---

Martin Chitwood, Esq., David A. Bain, Esq., Chitwood & Harley, Atlanta, GA, for Plaintiff.

James David Dantzler, Jr., J. Timothy Mast, McKenna Long & Aldridge, Atlanta, GA, Daniel E. Bacine, Esq., Robert A. Hoffman, Esq., Barrack, Rodos & Bacine, Philadelphia, PA, for Defendants.

### ORDER

EVANS, District Judge.

This civil action alleging violations of sections 11, 12 and 15 of the Securities Act of 1933 and sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder is currently before the Court on Defendants' Motion for Summary Judgment [# 145] and Plaintiffs' Motion for Leave to File Sur–Reply in Opposition to Defendants' Motion for Summary Judgment [# 172]. For the reasons set forth below, Defendants' Motion for Summary Judgment is GRANTED and Plaintiffs' Motion for Leave to File Sur–Reply is DENIED.

### I. Facts and Procedural History

The following facts are undisputed unless otherwise noted. This case originated in 1999 when twenty-three class action complaints were filed on behalf of open market purchasers of the common stock of World Access, Inc. ("WAXS") during the period from April 29, 1997 through February 11, 1999, as well as those who received WAXS common stock in connection with acquisitions completed by the company in the Fall of 1998. After five years of litiga-tion, only two Plaintiffs remain—William B. Tanner ("Tanner"), an open market purchaser from Memphis, Tennessee, who seeks to recover approximately $4.6 million in damages, and The Monetary Fund, Limited ("Monetary Fund"), a California-based hedge fund that received shares as a result of the 1998 Telco merger transaction, which seeks to recover approximately $40,000 in damages. In 2001, WAXS filed for bankruptcy and an automatic stay was issued. The remaining Defendants are the following former officers and/or directors of WAXS: Steven A. Odom ("Odom"), Chairman of the Board of Directors and Chief Executive Officer ("CEO"); Mark A. Gergel ("Gergel"), Executive Vice President and Chief Financial Officer ("CFO"); Martin D. Kidder ("Kidder"), Controller and a Director; Hensley E. West ("West"), President, Chief Operating Officer ("COO"), and a Director; and Steven J. Clearman ("Clearman"), a Director.

WAXS was formed in the late 1980s or early 1990s as a repairer and refurbisher of used telephone equipment. In its early years, the company also acted as a con-tract manufacturer of telecom products de-veloped and sold by third parties. By late 1994, the company's business strategy changed and it embarked upon a plan to become a full-scale manufacturer of its own products—referred to by an internal shorthand of being able to sell a "com-plete" or "turnkey" solution. The compa-ny planned to obtain its various products through the acquisition of other compa-nies, internal development and the licens-ing of proprietary technology developed by others. To that end, the company target-ed developing markets that were being opened up to competition through deregu-lation, particularly Latin America. Be-tween 1995 and January of 1998, WAXS also acquired six companies and became able to license the rights to other products,

including the right to sell those products under its own brand.

The fraud alleged in this case centers on one of those licensed products—a telephone switching product, the Compact Digital Exchange ("CDX") switch, marketed by WAXS between 1997 and early 1999. Plaintiffs' primary claim is that WAXS issued a series of false and misleading public statements concerning the CDX switch that artificially inflated the price of WAXS stock thus causing loss to Plaintiffs when WAXS's stock price fell. Essentially, Plaintiffs argue that WAXS represented the CDX switch as a "fully designed and operable product" when Defendants knew that the CDX switch was a "nonfunctional development stage prototype." [Amended Complaint ¶ 3].

In July of 1996, WAXS entered into a technology licensing agreement with Eagle Telephonics, Inc. ("Eagle") and International Communication Technologies, Inc. ("ICT") regarding a small, low-priced switch that Eagle had developed and sold under the name Eagle Digital Switching Central Office ("DSCO"). Under the terms of the agreement, Eagle retained ownership of the technology and controlled the engineering, but gave WAXS the exclusive right to manufacture, distribute, and sell the switch in certain countries, primarily in Latin America. WAXS also had the right to sell and market the DSCO switch under its own name and selected the CDX switch as its brand. A primary function of the CDX switch was to provide plain old telephone service ("POTS") to the end user, allowing for the processing of a call through the telephone network.[1] The CDX switch was much less expensive than the larger switches produced by other switch vendors. The CDX switch could be used as either a "Class 5" or a "Class 4"

switch. A Class 4 switch provides a connection from one part of a network to another, whereas a Class 5 switch provides more features and connects the telephone of an end user to the telephone network. The Class 5 switch was an example of WAXS's strategy to provide customers with "turnkey" solutions.

By approximately 1997, Eagle and ICT had installed DSCO systems in China, India, Bangladesh and Russia, many of which are still in use and operational today. In early 1997, WAXS shipped its first CDX switch along with another product known as WLL–2000, a wireless local loop product that WAXS licensed from another company, to Hondouras for a field trial and test installation with Empresa Hondurena De Telecomunicaciones ("Hondutel"). Shortly thereafter, the installation was complete and the system was operational with calls being successfully placed through the system. WAXS shipped and installed another CDX switch in Honduras in 1998. These systems involved CDX Class 4 switches.

In August of 1997, GCA Telecom ("GCA") in El Salvador placed purchase orders for several CDX switches, along with certain design, installation and training services to be provided by WAXS. Interoperability testing to ensure compatibility between the CDX switch and the national telephone network in El Salvador ("ANTEL") was completed in December 1997. In March of 1998, GCA and WAXS entered into a second contract which provided that WAXS would construct the GCA networks in La Gloria, Santa Ana and San Miguel and supply and install all of the telecommunications equipment for these networks. These systems involved CDX Class 5 switches in turnkey projects

---

1. Plaintiffs argue that while POTS was a required function of the CDX switch, it was also

intended to provide a variety of enhanced functions.

and thus were more complex and contained more features than previous installations.

Defendants state that the GCA networks were fully functional and complete in December of 1998. Plaintiffs dispute this and state that by the second quarter of 1998, problems with the functionality of the CDX switch became apparent and GCA was seriously unhappy with WAXS's performance. While Defendants point to the affidavit of one of the founders of GCA, Jose Belarmino Jamie ("Jamie"), in which he states that "[o]n behalf of GCA, I accepted the networks in La Gloria, Santa Ana and San Miguel as being complete in December 1998," Plaintiffs argue that no written documentation exists to confirm this statement. [ See Jamie Affidavit, ¶ 43; Pls.' Resp. to Defs.' Statement of Material Facts, ¶ 121]. Plaintiffs point to email and letter correspondence between GCA and WAXS officials discussing problems with the networks in which GCA officials threatened to withhold payment if the problems were not corrected. [Pls.' Resp. to Defs.' Statement of Material Facts, ¶¶ 101–119]. Plaintiffs assert that there was a rift within GCA between Jamie, some of the other founders of GCA and the Sanchez family, who had provided financial support to GCA. [Id. ¶ 122]. Plaintiffs claim that Jamie's certification of the networks as complete had little to do with their state of completion or performance but was, instead, directly related to a power struggle occurring within GCA for which Jamie desired WAXS's support. [Id.]. Defendants dispute this and acknowledge that while a number of performance problems occurred as the networks were "turned up" after the first calls were placed in July of 1998, that the networks were complete and functional by December of 1998.[2] [Defs.' Mot. for Summ. J. at 18]. Thus the events surrounding the completion and functionality of the GCA projects are disputed.

In 1998, WAXS also installed CDX switches in Ghana, Mexico and the Congo and the switches, Class 4 in nature, operated as intended. In 1999, WAXS completed additional CDX switch installations in Argentina, Guatemala and El Salvador.[3] Eagle currently continues to sell, market, and support the product under the DSCO brand name and by 2002 there were approximately 400–500 CDX switches installed and operational in twenty-eight countries.

Between 1994 and 1998, WAXS grew rapidly with revenues of $15.3 million in 1994, $30.1 million in 1995, $51 million in 1996, $93 million in 1997 and $211 million in 1998. In 1997 and 1998, WAXS's CDX switch installations, combined, accounted for a small percentage of the company's total revenue. CDX switches accounted

---

2. In addition to the affidavit of Jamie attesting to the completeness of the network, Defendants point to a letter of recommendation that GCA provided WAXS in December of 1999 indicating that the CDX switch had proven to be low maintenance and easy to use as well as the additional purchases and continued use of the CDX switch by GCA in 2001 and 2003.

3. Plaintiffs do not dispute that these additional installations were made but point out problems associated with the installation of CDX Class 5 switches in Italy in November of 1998

under an agreement with Aexis Telecom ("Aexis"). [Pls.' Resp. to Defs.' Mot. for Summ. J. at 36–41]. Defendants respond that this installation cannot be relevant to Plaintiffs' claims given the timing of the Aexis installation relative to Plaintiffs' purchases and to the disclosure of the alleged fraud. [Defs.' Reply at 7]. They contend that the problems associated with the Aexis project were a result of a problem with obtaining an appropriate carriers' license, not a result of problems with the functionality of the CDX switch. [Id.].

for approximately 5% of the company's 1997 revenues of $93 million. It accounted for approximately 4% of the company's 1998 revenues of $211 million.

In late 1998, WAXS completed mergers with three companies, NACT Telecommunications, Inc. ("NACT") and Telco Systems, Inc. ("Telco"), which were publicly held telecommunications equipment manufacturers who had their own products, and Cherry Communications Incorporated (d/b/a Resurgens Communications Group) ("Resurgens"), a facilities-based provider of international network access. These mergers had a significant impact on WAXS's size, revenue, product line, and service offerings. In November of 1998, analysts were projecting 1999 revenues for WAXS of roughly $900 million of which approximately 78% was related to these acquisitions. Analysts were also projecting that WAXS's "switching products," including products acquired from NACT and other refurbished equipment, would account for 14% of 1999 revenues, and projecting that the CDX switch would account for 23% of 1999 revenues. Plaintiffs do not dispute the projected CDX switch revenue for 1999 but note that because the CDX switch was sold at a higher profit margin than most other WAXS products, a given percentage of CDX switch revenues accounted for an even greater percentage of WAXS's earnings. The mergers also had a significant impact on the make-up of WAXS's management and Board of Directors. In December of 1998, John D. Phillips ("Phillips"), who had been CEO of Resurgens, was appointed as the new President and CEO of WAXS. Lindsay Wallace, formerly the President and CEO of NACT, was named Executive Vice President and COO of WAXS's Equipment Group. In addition, several new outside Directors were elected to the Board.

Throughout the relevant time period, WAXS and Defendants presented the CDX switch as a low-cost product targeted at emerging international markets and informed the market that the product was new and that WAXS had just begun to market and deploy the product. Defendants state that WAXS warned the market about the risks inherent in new product development such as the complexity and uncertainty of developing new, technologically advanced products and services; the possibility that new, complex products may contain undetected errors or failures when introduced; and, that these errors could result in a loss or delay in market acceptance of products as well as damage the company's reputation and financial condition. Plaintiffs dispute these assertions and state that generalized statements in Securities and Exchange Commission ("SEC") filings about deferral of orders, cancellation of orders, or return of products did not warn investors about known problems with the CDX switch.

Defendants state that the public statements made by WAXS regarding the CDX switch did not result in statistically significant price reactions and in no way inflated the price of WAXS's stock. Defendants state that of the announcements in 1997 and 1998 identified by Plaintiffs in the Amended Complaint in this case, only five coincided with statistically significant price reactions. Defendants assert that the market's reaction to these announcements was only temporary and that the price returned to the range predicted within two to three days. Defendants state that neither Plaintiff purchased WAXS stock between the time of these announcements and the time the stock price returned to its predicted range. Plaintiffs dispute these assertions and allege that WAXS's public statements concerning the CDX switch contained material misstatements and omissions that caused the price of WAXS

to be higher than it would have been had those statements disclosed all material information.

On January 5, 1999, WAXS announced: (1) that it had retained BT Alex Brown to advise it regarding strategic alternatives for its non-core businesses; (2) that it would take $90 million in special charges related primarily to the NACT, Telco and Resurgens mergers; (3) that while it expected revenues to be in line with analysts' expectations, its earnings per share would fall short of expectations for the quarter and year ending December 31, 1998; and (4) that the primary reason for the fourth quarter earnings shortfall was reduced margins in the resale of refurbished Northern Telecom switches and a lack of significant sales of CDX switches during the quarter due to the timing of customer buildouts. In response to this announcement, WAXS's stock price declined $8.875, a 41.8% decline from $21.25 on Monday January 4, 1999 to $12.374 on Tuesday January 5, 1999.

In mid-January 1999, Phillips, the new President and CEO, decided that the functionality of the CDX switch should be integrated into NACT's STX switch and that WAXS would cease supporting the CDX switch as a stand-alone product. Defendants West and Odom strongly disagreed with this decision.[4] However, Plaintiffs contend that WAXS abandoned the CDX switch due, in part, to customer dissatisfaction with the product and the lack of any significant sales during the third and fourth quarters of 1998. The reason WAXS stopped supporting CDX as a stand-alone product is thus disputed.

On February 11, 1999, WAXS announced: (1) finalized results for the quarter and year ending December 31, 1998; (2) earnings per share of $0.08 (rather than $0.15 as pre-announced on January 5, 1999); (3) additional one-time charges; (4) plans to sell non-core businesses; (5) special charges related to consolidations, downsizing and restructuring; and (6) that "in line with [its] recent decision to integrate the Class 5 functionality of CDX and the Class 4 functionality of NACT's STX switch into a next generation technology platform, reserves for potential doubtful accounts and potential inventory obsolescence were established to minimize the company's balance sheet exposure related to CDX, a relatively new international product." Following this announcement, WAXS's stock price declined $3.3125 or 28.8% from $11.50 on Thursday, February 11, 1999 to $8.1875 on Friday, February 12, 1999.

On April 8, 1999, WAXS filed its 1998 Form 10–K that incorporated its recent announcements including restructuring charges of $23.6 million which were taken in connection with the CDX switch. Following this announcement on April 9, 1999, the stock closed at $7.785, on Monday, April 12, 1999 the stock remained flat at $7.875, on April 13, 1999, the stock price increased to $8.125, on April 14, 1999, the stock price increased to $8.813, and by April 15, 1999, WAXS's stock price had climbed back up to $10 per share.

Plaintiff Tanner obtained most of his information relating to the alleged misinformation respecting the CDX switch from the Amended Complaint, which he read after it had been filed in this case. Between November 28, 1997 and January 23, 1998, Tanner purchased 79,000 shares of WAXS stock. After the market closed on February 12, 1998, WAXS issued a press release, which included information on its intended acquisition of Resurgens and that it would not meet analysts' projections for

---

**4.** Defendants West and Odom both left the company following this decision.

1997. This announcement caused the stock price to drop by $2.9375 (or 10.1%) from $30.625 on February 12 to $27.6875 on February 13. Also on February 12, 1998 but prior to the release of the negative news by WAXS, Tanner sold all of his WAXS holdings, garnering proceeds of over $2.3 million. He also "shorted" 10,000 shares of WAXS (meaning that he sold 10,000 shares that he did not yet own, with the expectation that the price would fall and he would be able to buy the shares back at a lower price and make a profit), and generated an additional $300,100 in short sale proceeds. On February 13, 1998, after the stock price dropped, Tanner covered his short sale, and repurchased 65,000 additional shares of WAXS. Plaintiff Tanner does not dispute the timing or amounts of these transactions but notes that he is not claiming any damages related to shares of WAXS stock purchased prior to April 1, 1998.

Between February 13, 1998 and July 29, 1998, Tanner accumulated more than 620,000 shares of WAXS stock, which had a value in excess of $17.5 million. Beginning in September of 1998, Tanner began selling his shares at a fairly quick pace and testified that he did so likely in reaction to the "Asian flu" that caused significant declines in the stock prices of telecommunications companies generally. [Tanner Dep. at 131–132]. By October of 1998, Tanner calculated that he had lost more than $11 million on his investment in WAXS but testified that these losses were the result of general market forces and not the product of the alleged fraud. [Tanner Dep. at 158–159].

After WAXS's stock price fell following the January 5, 1999 announcement, Tanner began purchasing WAXS stock again and purchased 25,000 shares that day. He made an additional purchase of 5,000 shares of WAXS stock on February 13, 1999 after WAXS's stock price had dropped again following the February 11, 1999 WAXS press release announcing lower earnings than earlier predicted. Tanner purchased more shares of WAXS in May of 1999, June of 1999, and August of 2000.

On September 18, 1998, Plaintiff Monetary Fund made its initial purchase of Telco Systems stock. Its decision to invest in Telco was not affected by any statements regarding the CDX switch (or WAXS in general) but was driven by Telco's historical and forecasted earnings. [Browne Dep. at 60, 63, 68]. Monetary Fund acquired 9,379 shares of WAXS as a result of WAXS's merger with Telco but (through its representative) does not recall being aware of the merger between WAXS and Telco; was not aware that the Telco Registration Statement was filed; never read the Telco Registration Statement, and was not aware that its Telco shares had been converted into WAXS stock until December 1998. [Browne Dep. at 56–57, 66, 71–72, 75]. Monetary Fund purchased additional shares of WAXS stock after the fraud was allegedly disclosed.

The public statements that WAXS made concerning the CDX switch, the stock market's reaction to those statements, and the knowledge that Defendants had concerning problems associated with the CDX switch are of primary importance in this case. However, because of the disputed nature of many of these facts, they will be recounted within the Court's substantive analysis.

## II. *Motion for Leave to File Sur–Reply*

As a initial matter, Plaintiffs have made a Motion for Leave to File a Sur–Reply to Defendants' Motion for Summary Judgment. Because no authorization exists in the Federal Rules of Civil Procedure nor the Local Rules of the Northern District of

Georgia for parties to file sur-replies, the allowance of a sur-reply is solely within this Court's discretion. Plaintiffs have already filed a reply to Defendants' Motion for Summary Judgment as allowed by Local Rule 7.1. L.R. 7.1, N.D. Ga. A review of Plaintiffs' Sur–Reply Motion indicates that it does not offer additional evidence or legal argument not already covered in its lengthy reply brief. Because the Court finds this sur-reply unnecessary, Plaintiffs' Motion for Leave to File a Sur–Reply is DENIED.

### III. *Motion for Summary Judgment*

#### A. *Standard*

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir.1996). On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1313 (11th Cir. 1999).

Summary judgment is improper "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir.1995). Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir.2000); *Ramsey v. Leath*, 706 F.2d 1166, 1170 (11th Cir.1983). Conversely, if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, then the issue of fact is genuine. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus, there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(internal citations omitted).

#### B. *Applicable Law*

Plaintiff Tanner claims that Defendants violated section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 promulgated thereunder. He also claims that Defendants are liable as controlling persons under section 20(a) of the Exchange Act and section 15 of the Securities Act of 1933 (the "Securities Act"). Plaintiff Monetary Fund claims that Defendants violated sections 11 and 12 of the Securities Act.

##### 1. *Section 10(b) and Rule 10b–5 claims*

Section 10(b) of the Exchange Act is a catch-all provision designed to prevent fraud not specifically prohibited under other sections of the Exchange Act or the Securities Act. Section 10(b) makes it unlawful for any person "[t]o use or employ ... any manipulative or deceptive device

or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). By the terms of section 10(b), no acts are illegal or prohibited unless they violate a rule or regulation promulgated by the SEC. The SEC therefore promulgated Rule 10b–5 which fleshes out the prohibition outlined in section 10(b). Rule 10b–5 specifically prohibits three types of actions:

(1) general defrauding "device[s], scheme[s], or artifice[s],"

(2) the making of any untrue statements of material fact or the omission of material fact necessary to make statements not misleading, or

(3) engaging in any act, practice or course of business that operates as a fraud or deceit upon any person in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (2000).

To allege a Rule 10b–5 violation, a plaintiff must show: (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiff relied, (5) that proximately caused plaintiff's injury. *See Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1202 (11th Cir.2001).

### a. *Materiality*

In a Rule 10b–5 violation, "[m]aterially misleading statements or omissions by a defendant constitute the primary element." *In re Miller Indus., Inc. Sec. Litig.*, 120 F.Supp.2d 1371, 1380 (N.D.Ga.2000) (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 246–47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). "A false statement or omission will be considered 'material' if its disclosure would alter the total mix of facts available to an investor and 'if there is a substantial likelihood that a reasonable shareholder would consider it important' to the investment decision." *Id.* (citing *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985)). Thus,

materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information. *Basic*, 485 U.S. at 240, 108 S.Ct. 978.

### b. *Scienter*

Scienter is also a necessary element of a section 10(b) and Rule 10b–5 violation. *Aaron v. SEC*, 446 U.S. 680, 695, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). According to the United States Supreme Court, scienter means "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The United States Court of Appeals for the Eleventh Circuit has advised that "[a] showing of severe recklessness satisfies the scienter requirement." *Ziemba*, 256 F.3d at 1202. It has defined severe recklessness as follows:

Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282 n. 18 (11th Cir.1999). While allegations of motive and opportunity such as insider stock sales, may contribute to an inference of severe recklessness, Plaintiffs cannot, standing on these allegations alone, demonstrate scienter. *Bryant*, 187 F.3d at 1285–86.

### c. *Reliance*

■ The reliance requirement establishes the casual link between the defendant's activities and the plaintiff's injuries and prevents federal securities law from affording unlimited liability. *Ross v. Bank*

*South,* 885 F.2d 723, 728 (11th Cir.1989) (citing *Lipton v. Documation,* 734 F.2d 740, 742 (11th Cir.1984)). Under certain circumstances, a presumption of reliance may be established when a requirement of actual reliance would make recovery a practical impossibility. *Id.* This presumption, deemed fraud-on-the-market, is based on the hypothesis that in a modern and efficient securities market, the market price of the stock incorporates all available public information. *Basic,* 485 U.S. at 246–47, 108 S.Ct. 978. Therefore, any person who trades shares relies on the integrity of the market price and misleading statements will defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. *Id.* at 241–42, 246, 108 S.Ct. 978. The *Basic* Court advised that the presumption is rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic,* 485 U.S. at 248, 108 S.Ct. 978. Thus, when an alleged misrepresentation does not affect the market price of the security in question, the presumption is rebutted and a fraud-on-the-market theory of recovery may not be used to satisfy the reliance element. *See Nathenson v. Zonagen Inc.,* 267 F.3d 400, 415 (5th Cir.2001).

d. *Causation*

■ To prove the final element of a 10b–5 violation, a plaintiff must prove both "transaction causation" and "loss causation." *Bruschi v. Brown,* 876 F.2d 1526, 1530 (11th Cir.1989). Transaction causation is another way of describing reliance and is "established when the misrepresentations or omissions causes the plaintiff to engage in the transaction in question." *Currie v. Cayman Res. Corp.,* 835 F.2d 780, 785 (11th Cir.1988) (internal citations omitted). Thus, transaction causation is

akin to actual or "but for" causation. *Robbins v. Koger Properties, Inc.,* 116 F.3d 1441, 1447 (11th Cir.1997).

To prove loss causation, a plaintiff must show "that the untruth was in some reasonably direct, or proximate, way responsible for his loss." *Huddleston v. Herman & MacLean,* 640 F.2d 534, 549 (5th Cir. 1981), aff'd in part, rev'd in part on other grounds, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). "If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted." *Id.* Loss causation describes "the link between the defendant's misconduct and the plaintiff's economic loss." *Robbins,* 116 F.3d at 1447 (quoting *Rousseff v. E.F. Hutton Co., Inc.,* 843 F.2d 1326, 1329 n. 2 (11th Cir.1988)). However because market responses "are often the result of many different, complex, and often unknowable factors, 'the plaintiff need not show that the defendant's act was the sole and exclusive cause of the injury' " rather only that it was a substantial or significant contributing cause. *Id.* (quoting *Bruschi,* 876 F.2d at 1531).

2. *Sections 15 and 20(a) claims*

Under both the Securities Act and the Exchange Act, any person who "controls" a liable person is equally liable. *See* 15 U.S.C. § 78t(a) (1997) (Section 20a); 15 U.S.C. § 77o (1997) (Section 15). The SEC's implementing regulations define "control" as "the possession, direct or indirect, or the power to direct or cause the direction of the management policies of a person." 17 C.F.R. § 230.405. In the Eleventh Circuit, "a defendant is liable as a controlling person ... if he or she had the power to control the general affairs of the entity primarily liable at the time the

entity violated the securities laws ... [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir.1996). Although sections 15 and 20(a) each incorporate a special defense into their statutory provisions, the controlling person analysis under each section is identical. *See In Re JDN Realty Corp. Sec. Litig.*, 182 F.Supp.2d 1230, 1241 n. 7 (N.D.Ga.2002). However, if there is no primary violation of securities law, then there can be no violation under sections 15 or 20(a).

### 3. *Section 11 claim*

Section 11 of the Securities Act sets forth liability with respect to any material misstatement or omission in a registration statement. A plaintiff alleging a section 11 violation must prove that "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a) (1997) (Section 11). Thus, a plaintiff need not prove scienter or reliance for a section 11 violation.

### 4. *Section 12(a)(2) claim*

Section 12(a)(2) of the Securities Act provides a remedy against one who sells a security by means of a prospectus or oral communication, which includes an untrue statement of material fact, or omits to state a material fact necessary to make the statement, in light of the circumstances under which it was made, not misleading. 15 U.S.C. § 77l (1997). It does not require an intent to defraud on the part of the defendant, or even knowledge of the misrepresentation or omission. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Reliance on the statement by the plaintiff is also not required.

### C. *Analysis*

#### 1. *Section 10(b) and 10b–5 claims*

The following public statements made concerning the CDX switch form the basis of Plaintiff Tanner's 10b–5 claims.[5] First, Tanner points to WAXS's SEC filings. In WAXS's 1996 Form 10–K filed with the SEC,[6] it stated:

> [T]he Company has recently started to manufacture and test its own microprocessor-based, modular, digital central office switch, the [CDX switch]. The CDX switch employs extensive large scale integrated circuit technology, which permits the provision of advanced telephony services such as call waiting, call forwarding and conference calling, and requires reduced power and floors-

---

**5.** All of the public statements that Plaintiffs allege are false and misleading occurred before December of 1998, thus the Court will limit its review to those statements. The Court also concentrates only on the alleged fraud with regard to the CDX switch. Plaintiffs' amended complaint contains a number of allegations regarding accounting fraud but Plaintiffs have not presented evidence to support those allegations. As Plaintiffs concede in their Reply to Defendants' Motion for Summary Judgment, they have decided to "streamline" their case by focusing solely on the CDX switch. [Pls.' Reply to Defs.' Mot.

for Summ. J. at 41 n. 3]. The Court considers these allegations abandoned. *See In re Miller Indus.*, 120 F.Supp.2d at 1377 (noting that Plaintiffs produced no evidence to support certain allegations of securities fraud in complaint and that those claims were "quietly abandoned").

**6.** The SEC requires all publicly traded companies to file a 10–K report annually each year. It contains detailed information about a company's business, finances, and management.

pace compared with existing products. The current switch design serves applications up to 4,000 subscriber lines and is expandable to over 60,000 lines through future software enhancements. The CDX switch is targeted for use in the international marketplace due to its compatibility with international standards, "plug and play" installation features and tolerance of a wide range of environmental conditions.

In March 1997, the Company shipped its first CDX switch to Empresa Hondurena De Telecomunicaciones ("Hondutel") under a first office application agreement. Hondutel has agreed to test the switch against predefined performance measurements during the second quarter of 1997. The sales price of this initial shipment will be paid by Hondutel at the end of the successful test period. The Company expects to begin selling and delivering the CDX switch on a broader scale in the second half of 1997, although there can be no assurance that the Company will meet this schedule or that the Company will generate material sales from the switch. [WAXS 1996 Form 10–K, filed April 11, 1997]. WAXS's 1997 10–K contained the first paragraph quoted above and also stated that with WAXS's acquisition of NACT it had "significantly expanded its offering of proprietary, advanced technology switching products and software applications." [WAXS 1997 Form 10–K, filed April 15, 1998].

Second, Plaintiff Tanner points to WAXS's press releases that mention the CDX switch. In a April 29, 1997 press release announcing first quarter 1997 results, Odom, the then Chairman and CEO of WAXS, was quoted as stating:

In addition to the continued growth in the Company's sales and profits, we were extremely active throughout the first quarter of 1997 on the new product development front. In March, the Company shipped its first [CDX switch] and [WLL–2000] to [Hondutel] under a first office application agreement. The CDX switch has been designed using advanced microprocessor based technology, which permits the provision of complete telephony services including local, tandem and/or toll applications. The Company's WLL–2000 is a low cost, fixed wireless point-to-multipoint system that allows two way voice and data transmission utilizing remote radio base stations and integrated antenna and electronics units located at end users' premises.

As previously noted, our initial targeted market for the CDX and WLL–2000 is Latin America and the Caribbean Basin, where there is significant pent-up demand for low cost, modular, next generation technology products that provide basic telephone service. Both of these new World Access products have been specifically designed to be compatible with international standards and meet unique customer requirements such as flexible programming, modular design, small physical size and tolerance of a wide range of environmental conditions. Test results to date in Honduras have been quite encouraging and we continue to believe these new proprietary international products will begin generating significant new sales and further improvements in gross profit margins for the Company beginning in the second half of 1997.

[WAXS Press Release, April 29, 1997]. In a July 29, 1997 press release announcing WAXS's second quarter 1997 results, West, the then President and COO of WAXS, was quoted as stating:

In addition to the continued growth in the Company's sales and profits, we

were extremely active throughout the second quarter of 1997 with the Company's two new international products, the [CDX switch] and Wireless Local Loop–2000 (TM) system ("WLL–2000(TM)")....

CDX and WLL–2000 sales for the quarter were approximately $500,000 primarily from a successful first office application agreement with Hondutel. Feedback from several large international customers has been encouraging and we continue to believe these new international products will generate significant new sales for the Company beginning in second half of 1997. Specifically, the Company has recently entered into an agreement with a private network operator in El Salvador for the deployment of 40,000 lines of phone service over the next two years utilizing the CDX switch. The first purchase orders under this new agreement are expected shortly.

[WAXS Press Release, July 29, 1997]. In a October 27, 1997 press release announcing WAXS's third quarter 1997 results, Odom was quoted as stating:

The remaining $6.3 million [of the overall $15 million increase in total sales] in incremental sales was a result of new World Access proprietary product sales and continued growth within the Company's remanufactured equipment and service businesses. Most notably, during the third quarter of 1997 the Company entered into an agreement with a private network operator in Central America for the deployment of 40,-000 lines of phone service over the next two years utilizing the Company's [CDX switch]. In September, approximately $1.8 million in sales were realized as a

result of CDX shipments made in connection with the first two purchase orders received under this agreement.

As a result of increased product sales, the first volume shipments of the CDX switch, the CIS and Galaxy acquisitions and improved efficiencies in the Company's operations, the Company's overall gross profit margins increased from 29.4% in the year 1996 to 37.9% in the third quarter of 1997....

[WAXS Press Release, Oct. 27, 1997]. In a March 5, 1998 press release announcing WAXS's fourth quarter 1997 results, Odom was quoted as stating that "[d]uring the second half of 1997, the Company sold approximately $6.5 million of its two new international products, the [CDX switch] and Wireless Local Loop–2000(TM) system. Based on the strength of several new contracts, we expect the sales of these new products to continue to increase during 1998." [WAXS Press Release, March 5, 1998].

Third, Tanner points to Registration Statements filed in connection with several mergers. In WAXS's Form S–4 [7] filed with the SEC in connection with the NACT merger, it made statements identical to those in its Form 10–Ks describing the CDX switch and how the NACT merger would help to expand WAXS's offering of switching products. [WAXS Form S–4, filed Oct. 6, 1998]. In WAXS's Form S–4 filed with the SEC in connection with the Telco merger, it also made a statement describing the CDX switch identical to the one from its Form 10–Ks.

#### a. *Misstatements or Omissions*

■ The Court must first consider if a genuine issue of material fact exists re-

---

**7.** A Form S–4 is a Registration Statement filed with the SEC when a company is issuing shares of its stock in connection with a busi-

ness combination transaction, such as an acquisition or a merger.

garding whether Defendants made misstatements or omissions about the CDX switch. Plaintiff Tanner argues that Defendants emphasized repeatedly in their public statements that the CDX switch was the Company's first proprietary product, could be sold at higher margins than other Company products, and was the lynchpin of WAXS's strategy to position itself as a turnkey provider of telephone networks. Tanner states that contrary to these public representations, WAXS was only engaged in two turnkey network projects with the CDX switch, both of which were undergoing problems. Defendants respond by pointing to the successful installation and operation of the CDX switch in Honduras, Ghana, China, Bangladesh and Mexico during the relevant time period, all which involved Class 4 CDX switch installations. Regarding the GCA Class 5 installation in El Salvador, Defendants argue that the evidence shows that the installation was successful, operational and fully functional by December of 1998. They argue that WAXS accurately portrayed the CDX switch as a new product and never represented it to be mature. Finally, Defendants dispute Plaintiff's contention that the CDX switch was insufficiently tested.

After several years of litigation, the Court has before it extensive evidence concerning the CDX switch including deposition testimony, expert witness reports, SEC filings and voluminous public and company records. As the evidence has developed, so has Plaintiff Tanner's theory of the alleged fraud in this case. Plaintiff's amended complaint and earlier motions argued that while Defendants represented the CDX switch as a new, exciting product it was in reality little more than a non-functional prototype. Later, when the evidence demonstrated that the CDX switch was indeed functioning in several countries, Tanner shifted his focus to the distinctions between WAXS's Class 4 CDX switch installations and Class 5 CDX switch installations arguing that Defendants represented the CDX switch as the key component of their "turnkey strategy" but had only installed the Class 5 version of the switch in two projects, both of which were problematic. As evidence develops in a case, litigants often change their strategy and to do so is perfectly within their rights. In this case, however, the shift in focus is revealing because it helps to demonstrate how little the discovery has assisted Plaintiff Tanner in raising a genuine issue of material fact as to whether Defendants violated the securities laws.

First, the evidence is clear that WAXS's statements that the CDX switch was functioning in several countries in 1997 and 1998 were correct. While Tanner is correct that all of these installations were with Class 4 switches, reviewing the public statements from this time period does not show that Defendants falsified or omitted this fact. WAXS's 1996 Form 10–K discussed the Honduras installation stating that WAXS had shipped its first CDX switch to Hondutel under a "first office application agreement." [WAXS 1996 Form 10–K, filed April 11, 1997]. The April 29, 1997 press release announcing first quarter 1997 results stated that "[t]est results to date in Honduras have been quite encouraging." [WAXS Press Release, April 29, 1997]. The July 29, 1997 press release announcing second quarter 1997 results stated that "CDX and WLL–2000 sales for the quarter were approximately $500,000 primarily from a successful first office application agreement with Hondutel." [WAXS Press Release, July 29, 1997]. These public statements did not represent the Honduras installation to be "turnkey" but simply stated that an initial agreement had been made and that the project was generating revenue.

Second, the general statements WAXS made about the CDX switch's performance or future outlook do not reveal false or omitted facts. WAXS's 1996 Form 10–K contained a description of the CDX switch technology stating that it "employs extensive large scale integrated circuit technology, which permits the provision of advanced telephony services ... and requires reduced power and floorspace compared with existing products." [WAXS 1996 Form 10–K, filed April 11, 1997]. It further stated that the CDX switch is "targeted for use in the international marketplace due to its compatibility with international standards, 'plug and play' installation features and tolerance of a wide range of environmental conditions." [*Id.*]. The 1996 Form 10–K concluded its description by stating that WAXS "expects to begin selling and delivering the CDX switch on a broader scale in the second half of 1997, although there can be no assurance that the Company will meet this schedule or that the Company will generate material sales from the switch." [*Id.*]. The April 29, 1997 press release stated that "we continue to believe that these new proprietary international products [discussing the CDX switch and WLL–2000] will begin generating significant new sales and further improvements in gross profit margins for the Company beginning the second half of 1997." [WAXS Press Release, April 29, 1997]. The July 29, 1997 press release also contained generalized statements noting that "[f]eedback from several large international customers has been encouraging ...." [WAXS Press Release, July 29, 1997].

There is no evidence in the record that shows these generalized statements to be false. WAXS's description of the CDX switch in its 10–Ks was just that, a description of the switch's technological capabilities. The description noted that the CDX switch was targeted for use in developing countries and that it was a new, proprietary product. WAXS also included the disclaimer that while the Company expected to begin selling and delivering the CDX switch on a broader scale that WAXS was not guaranteeing that it would meet any exact timetable or that the CDX switch would produce material sales. These generalized statements thus included measured descriptions of the CDX switch's capabilities while noting that WAXS could not offer assurance that the new product would ultimately be a success. Likewise, the statements do not contain omissions. WAXS gave a description of the product as well as a warning, it did not have a duty to do more.

Finally, WAXS's public statements concerning the GCA project, a Class 5 switch installation, the project at the heart of Plaintiff Tanner's claims, were not false and did not contain omissions. The July 29, 1997 press release stated that "the Company has recently entered into an agreement with a private network operator in El Salvador for the deployment of 40,000 lines of phone service over the next two years utilizing the CDX switch" and that the "first purchase orders under this new agreement are expected shortly." [WAXS Press Release, July 29, 1997]. WAXS's press release announcing the GCA project stated that the contract had a potential value in excess of $20 million and also "represents a major vote of confidence in the strategic initiatives we've undertaken over the past few years to broaden the World Access line of proprietary telecommunications equipment and services and position the Company to engineer, install, and support 'turnkey' telecommunications network solutions." [WAXS Press Release, March, 5, 1998]. Thus, the public statements about the GCA installation represented it to be a major new project and

one that was an example of WAXS's strategy to provide turnkey solutions.

A review of the internal memorandums and emails concerning the problems in the GCA project, which could contain information that WAXS should have disclosed in its public statements, demonstrates only that the deployment of the CDX switch in El Salvador experienced various performance difficulties. The evidence shows that in November of 1997, Ben Cowart ("Cowart"), WAXS's Director of Product Development, sent an email detailing the obstacles that had to be overcome to have a smooth deployment. [Cowart Dep., Vol. II, Ex. 61]. In January of 1998, Cowart sent a letter to Eagle stating that "[w]e are weeks away from our first major deployment and are still identifying problems relating to system performance." [Cowart Dep., Vol. I, Ex. 6]. Cowart testified that in the first or second quarter of 1998, GCA was "seriously unhappy" with WAXS's performance because of some problems that occurred when the initial subscribers to the network were "turned up." [Cowart Dep., Vol. II, at 404–405]. During 1998, GCA sent WAXS several letters about specific problems with the network, mainly delays in meeting deadlines. [Cowart Dep., Vol. II, Ex. 64; West Dep., Ex. 4]. In August of 1998, GCA sent a letter expressing encouragement on recent progress made by WAXS but also threatening to withhold payment until delays with delivery were remedied. [Gergel Dep., Ex. 13]. A series of emails from October of 1998 between GCA and WAXS also reveal some remaining problems with the network including "dropped calls", some subscribers not receiving dial tones, and busy signals. [Cowart Dep., Vol. II. Ex.'s 66, 57].

While Defendants do not deny that these problems existed, they point to the Jamie affidavit stating that the networks were fully functional by December of 1998.

Plaintiff Tanner responds that "Jamie's purported certification of the three networks had little to do with their state of completion or performance, but was, instead, directly related to his attempts to wrest control of GCA from the Sanchez family." [Pls.' Resp. to Defs.' Mot. for Summ. J. at 34]. Tanner argues that Jamie only signed the certification so that WAXS would support Jamie in his power struggle with the Sanchez family. In support of this argument, Plaintiff Tanner points to a December 15, 1998 WAXS memorandum updating the GCA installation which discussed GCA's refusal to sign the "acceptance letter" and WAXS's resulting options, including "buying out" the Sanchez family. [Pls.' Resp. to Defs.' Mot. for Summ. J. Ex. 8].

The facts surrounding GCA's acceptance of the network suggests that Jamie may have accepted the network as completed based on more than the merits of the installation. However, Plaintiff's argument is that WAXS should have disclosed these problems with the CDX switch and that its failure to do so rendered WAXS's statements about the product's maturity false. Thus even if the Court agreed that Plaintiff had raised a genuine issue of fact regarding Jamie's acceptance of the installation, this does not satisfy Plaintiff's burden. A power struggle within GCA and some documented performance problems with the CDX switch's "turnkey" capabilities does raise a genuine issue of material fact about whether WAXS's public statements were false or contained an omission. Despite Plaintiff's assertion otherwise, WAXS's public statements never represented the CDX switch to be a mature product. Rather, they noted this to be the first "turnkey" installation. The fact that some performance problems existed in the first "turnkey" installation is thus not surprising. Likewise, Plaintiff Tanner has not shown that Defendants had a duty to

disclose these problems.[8] While the investing public certainly has a right to be kept full informed, that right of information cannot extend to every small problem a company may experience with a new product.[9] Therefore, the Court finds that Plaintiff Tanner has failed to demonstrate a genuine issue of material fact regarding whether Defendants' statements were false or contained an omission. While this conclusion alone mandates entry of summary judgment for the Defendants on the 10b–5 claim, because of the complex and lengthy nature of this case, the Court proceeds to discuss briefly the other elements of the claim.

### b. *Materiality*

 Even assuming that WAXS's statements concerning the CDX switch were false or misleading, Plaintiff Tanner must show a substantial likelihood that the disclosure of the omitted or corrected fact would be viewed by the reasonable investor as having significantly altered the total mix of information available. Defendants argue that Tanner cannot make this showing because WAXS's public statements regarding the CDX switch did not alter WAXS's stock price, Defendants adequately cautioned the investing public about the risks associated with WAXS stock pur-

chases, and any optimistic statements regarding the CDX switch were opinion or mere puffery. Plaintiff Tanner counters that WAXS's stock price was inflated due to WAXS's public statements about the CDX switch because the stock declined significantly after WAXS made unfavorable announcements about the CDX switch on January 5, 1999 and February 11, 1999, that the "bespeaks caution" doctrine is not available to WAXS because Defendants' cautionary language was boilerplate, and that Defendants' optimistic statements are actionable because WAXS did not reasonably believe that they were accurate.

Both parties proffer expert "event study" reports that contain contrasting conclusions on the effect of the CDX switch related announcements on WAXS's stock price.[10] Defendants' expert, Dr. Craig McCann ("McCann") looked at the allegedly false and misleading disclosures and found no statistically significant positive price reaction to any CDX-related disclosure. Plaintiff's expert, Michael A. Marek ("Marek") concentrated on the decline of WAXS's stock price following the January 5, 1999 and February 11, 1999 announcements and found that the decline demonstrated that the stock was artificially inflated. Case law offers inconsistent guidance on whether a court should look at

---

**8.** The Supreme Court has recognized that requiring companies to disclose every detail of corporate development would inundate shareholders with information of "dubious significance." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Such a requirement would do little for informed decision-making on the part of the shareholder. *Id.* Whether Defendants had this duty to disclose is also significant under the materiality analysis, *infra*, because Defendants must have a duty to a disclose for an omitted fact to be material.

**9.** To demonstrate Defendants' statements were false, Plaintiff also points to the Aexis installation in Italy and evidence that WAXS

acknowledged that "bugs" in the CDX switch still existed in 1999. Because this evidence involves the time period after WAXS made the alleged misstatements, it is not relevant to Plaintiff's 10b–5 claim.

**10.** An event study is a statistical regression analysis that examines the effect of an event, such as an allegedly fraudulent statement or omission, on a dependent variable, such as a company's stock price. The event study method "is an accepted method for the evaluation of materiality [and] damages to a class of stockholders in a defendant corporation." *In re Imperial Credit Indus. Sec. Litig.*, 252 F.Supp.2d 1005, 1014 (C.D.Cal.2003).

the stock price at the time of the allegedly fraudulent statements or omissions or at the time of the "correct disclosures." *See, e.g., Nathenson,* 267 F.3d at 419; *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1425 (3rd Cir.1997). However, in this case both would be important to the reasonable investor. If the public statements surrounding development of the CDX switch and its importance to WAXS were material to investors, the market would have accordingly reacted in a positive manner when the announcements were made. Similarly, the market would have reacted in a negative manner when announcements were made that the CDX switch was not performing as expected. Here, Plaintiff Tanner does not deny that the market did not react to CDX related disclosures in 1997 and 1998 in a statistically significant manner. But the market did react to the announcements in early 1999 in a negative manner. Thus Plaintiffs have not demonstrated what value the market placed on the CDX switch up to the point of the negative news.

Moreover, the early 1999 announcements did not solely concern the CDX switch. Rather, the January 5, 1999 statement announced not just that WAXS would fall short of expected revenues due in part to the lack of significant sales of the CDX switch but that the lack of resales from refurbished Northern Telecom switches contributed to the decline. This statement also announced that WAXS would take $90 million in special charges related to several 1998 mergers. The February 11, 1999 statement contained more bad news, again not all related to the CDX switch. This statement announced even lower earnings than the January 5 announcement had predicted, additional one-time charges, plans to sell certain non-core businesses and other charges related to restructuring.

Plaintiff Tanner has not pointed to any evidence, other than his expert report which primarily concerns the effect of the negative news on WAXS's stock price, that shows that a reasonable investor would have considered the information in the CDX switch related disclosures in 1997 and 1998 to be material.[11] He has also not pointed to evidence sufficient to show that the CDX switch related disclosures from early 1999 were what made the stock price drop so drastically. The Court thus concludes that a genuine issue of material fact also does not exist as to the materiality element of Plaintiff's 10b–5 claim.

### c. *Scienter*

A showing of severe recklessness is required in the Eleventh Circuit to satisfy the scienter requirement. This standard requires an "extreme departure from the standards of ordinary care." *Bryant,* 187 F.3d at 1282 n. 18. The gist of Plaintiff's 10b–5 claims is that the CDX switch was not the mature "turnkey" product as represented by Defendants and that Defendants should have revealed the problems that occurred with the GCA installation. As discussed above, the evidence does not create a triable issue of fact as to whether Defendants represented the product as mature. In fact, Defendants represented it at all times to be a new product. Additionally, Defendants were under no duty to disclose every problem it had in the GCA installation with the investing public. Given these findings, Defendants could not have acted with the requisite "severe recklessness."[12]

---

11. Plaintiff Tanner even testified that he understood that the CDX switch was a new product for which WAXS did not have a proven track record. [Tanner Dep. at 115].

12. Plaintiff Tanner puts much emphasis on

#### d. *Reliance*

█ Because Plaintiff Tanner continued to purchase WAXS stock after the negative CDX-related disclosures in early 1999 and testified that the CDX switch technology was unrelated to his decision to invest in WAXS, the most difficult part of Plaintiff's 10b–5 claim is demonstrating the reliance element. Tanner relies on the fraud-on-the-market presumption to establish reliance. However, the presumption is rebutted by any evidence that severs the link between the alleged misrepresentation and the price paid by Tanner.

Here, much evidence severs the link. First, as discussed, the evidence does not demonstrate that WAXS stock was artificially inflated due to its CDX switch related statements when Tanner purchased his stock. Second, Tanner continued to purchase WAXS stock after he learned of the alleged misrepresentations in early 1999. *See Rolex Employees Ret. Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 664 (D.Or. 1991) (holding that fact that Plaintiff continued to trade in stock after he learned of the alleged misrepresentations rebutted the presumption of reliance). Due to the timing of his purchases, the only thing that Tanner appears to have relied upon is that WAXS stock would eventually go back up. Specifically, Tanner testified that he decided to invest in WAXS because he believed that it would be acquired by another company, WorldCom. [Tanner Dep. at 103–04, 127–30]. As the Court previously noted in its Order denying class certification

in this case, "Tanner's actions on January 5, 1999 directly counter the premise upon which the fraud-on-the-market theory is based." [Order Denying Class Certification, July 1, 2002 at 33]. Plaintiffs have produced no evidence since that time to change this Court's conclusion. Thus, no genuine issue of material fact remains as to the reliance element.[13]

#### 2. *Other Claims*

█ Plaintiff Tanner's section 20(a) and section 15 claims are dependent upon a finding that there is a triable issue of fact as to whether a primary violation of securities law has occurred. Because there is not, these claims accordingly fail. Similarly, Plaintiff Monetary Fund's claims under sections 11 and 12(a)(2) of the Securities Act fail because they are dependent upon the showing of an untrue statement of material fact in a registration statement. The Court's conclusion that the public statements, including those in the registration statements at issue, were not false and did not contain an omission as well as were immaterial precludes success on these claims. While reliance and scienter are not required to prove these latter claims, the failure of proof on the primary elements of falsity and materiality, mandate summary judgment for Defendants.

#### IV. *Conclusion*

Accordingly, finding no genuine issue of material fact the individual Defendants' Motion for Summary Judgment [# 145] is

---

the fact that various Defendants sold their WAXS stock during the relevant time period. However, motive and opportunity alone are not enough to satisfy the scienter element without other evidence of severe recklessness. Several Defendants also held their WAXS stock through the "curative disclosure" and others offered reasonable explanations as to why they sold their stock.

**13.** As the final element in a 10b–5 claim, causation, depends on the connection between the misstatements and omissions and a plaintiff's investment decision, and the Court has found that no genuine issue of material fact remains as to whether WAXS made false or misleading statements or whether Plaintiff Tanner relied on these statements, it need not examine the causation question.

GRANTED. The automatic stay of the case against Defendant WAXS precludes granting summary judgment to it but should the stay be lifted, Defendant WAXS may make an appropriate motion to the Court in accordance with this Order. Plaintiffs' Motion for Leave to File Sur–Reply in Opposition to Defendants' Motion for Summary Judgment [# 172] is DENIED. The Clerk is DIRECTED to enter judgment for the individual Defendants and close the file.